UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

RONALD McCALISTER,

      Plaintiff,

v.                             Case No.  8:04-cv-2588-T-30TGW

HILLSBOROUGH COUNTY SHERIFF,

      Defendant.

_____/

## ORDER

THIS CAUSE comes before the Court upon Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. #23-1), Notice by Hillsborough County Sheriff regarding Motion for Summary Judgment and supporting memorandum of law (Dkt. #24), Plaintiff's Response to Defendant's Motion for Summary Judgment (Dkt. #27), and Affidavit of Ronald McCalister (Dkt. #28). The Court, having considered the motion, response, memoranda, affidavits, depositions, exhibits, and being otherwise advised in the premises, finds that Defendant's Motion for Summary Judgment should be granted.

### Procedural Background

On November 30, 2004, Plaintiff, Ronald McCalister ("Plaintiff" or "McCalister"), filed this lawsuit against the Defendant, Hillsborough County Sheriff ("Defendant"), alleging discrimination based on his race (African-American), denial of equal protection and deprivation of his right to equal terms and conditions of employment in a two-count complaint pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§2000e, et seq. ("Title VII") and the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §1983 ("Section 1983").

Defendant now moves for summary judgment on Plaintiff's claims of employment discrimination by official policy or procedure and disparate treatment by forced resignation.

## **Factual Background**

Plaintiff, an African-American male, was employed by the Hillsborough County Sheriff, from June of 1994 until March of 2003.  McCalister began working off-duty law enforcement assignments in 2000.  One of the off-duty jobs McCalister performed was pursuant to a contract between Defendant and the United States Central Command ("CENTCOM").  Specifically, CENTCOM hired Defendant to provide continuous security coverage for the purpose of guarding military personnel living at the SOHO apartments in Hyde Park.  Defendant was contractually bound to provide, among other technical requirements: one Law Enforcement Officer and one Law Enforcement vehicle/cruiser 24 hours a day, 7 days a week, 365 days a year; maintain a fully armed presence at all times; remain in/or around the Law Enforcement vehicle in a highly visible location by the front office of each lodging facility; execute a foot patrol throughout the entire facility randomly at approximately two-hour intervals; and be on site at all times during duty hours.[1]

By December of 2002, McCalister worked the SOHO off-duty assignment approximately ten to fifteen times.  On December 16, 2002, McCalister was assigned to work

---

[1] *See* Affidavit of Linda Unfried, Dkt. #24-4, Exhibit "A".

an eight hour off-duty shift beginning at 11:00 pm and ending at 7:00 a.m the next day.

Shortly after 4:00 am during this shift, McCalister left his assignment without the permission

of his supervisor to socialize with a female friend acquaintance approximately twelve miles

away in Town & Country.  McCalister testified that he and the woman had prearranged by

phone to meet during those early morning hours at a corner on River Oaks Street in Town

& Country.

From the SOHO apartments, McCalister drove his assigned Sheriff's Office patrol car

to his home, approximately fifteen minutes away.  When he arrived home, he got into his

personal vehicle and put a black sweatshirt on over his patrol uniform.  McCalister did not

remove his brass or his utility belt, and did not remove or cover his uniform pants and shoes.

From his home, McCalister drove a few minutes to the residential area of Town &

Country, where he planned to meet the woman.  However, before McCalister was able to

locate her, he was pulled over by Deputy Timothy Locke while driving below the speed limit

on River Oaks Street at approximately 4:30 a.m.  McCalister was driving 20 mph in a 25 mph

zone.  Deputy Locke observed McCalister drive slowly down a cul-de-sac and pull off the

road before making a three-point turn to emerge from the dead end road.  Deputy Locke ran

McCalister's license plate number in his patrol car computer and discovered that the car was

not registered to the Town & Country neighborhood.  Due to the early hour and McCalister's

suspicious driving, Deputy Locke turned on his patrol car lights and conducted a traffic stop.

Deputy Locke asked McCalister where he was going, and McCalister said he was

"going to meet somebody."  Plaintiff has alleged that Deputy Locke responded by saying,

"bullshit." Deputy Locke asked McCalister for his identification, so McCalister showed him his wallet, which contained his Sheriff's Office badge. After looking at McCalister's badge, Deputy Locke walked back to his patrol car and turned off his lights. He then approached McCalister's vehicle again and said, "You should understand the job that I am doing because you are a deputy too." McCalister then told Deputy Locke , "You are wrong for the way you conducted the stop and you better watch how you treat people." Apparently, McCalister then accused Deputy Locke of pulling him over for "driving while black." Nevertheless, it does not appear from the record that Deputy Locke made statements to McCalister regarding his race at any time during the traffic stop.

McCalister subsequently left (without a traffic citation or warning) and drove to his home, where he removed his sweatshirt, switched back to his patrol car and returned to the SOHO apartments. He arrived at the SOHO apartments between 5:00 and 5:15 a.m. In the meantime, Deputy Locke contacted his immediate supervisor, Corporal Collado, to inform him that he had just encountered an individual who claimed to be a Sheriff's Deputy and drove a car registered to "Ronald McCalister."

Corporal Collado, who used to be McCalister's co-worker, recognized McCalister's name and determined that he was scheduled to be at the SOHO apartments at that time. Corporal Collado went to the SOHO apartments to look for McCalister, and found him near the SOHO clubhouse, talking on the phone. Corporal Collado also observed that McCalister had turned off his patrol car radio, rendering him unreachable by dispatch. McCalister told

Collado that he had left the job to deliver his personal vehicle to a friend, covered his uniform with a sweatshirt, and that he was pulled over by Deputy Locke.

Corporal Collado called the off-duty coordinator to inform him that McCalister had admitted to leaving his post. Corporal Collado wrote a report on the incident, and gave it to District Commander Rene Rodriguez, who referred the incident to Internal Affairs for investigation.

To receive credit for working a CENTCOM off-duty assignment, an employee is required to a complete a Coalition Off-Duty Report/Job Confirmation form. On December 17, 2002, McCalister submitted his signed Coalition form, indicating the he had completed a full eight-hour shift on the night of December 16, 2002.

On January 27, 2003, Internal Affairs concluded that McCalister had violated the following six Sheriff's Office rules: (1) 3.4.01, Leaving Assigned Work Area; (2) 3.5.02, Negligence - Associated with Safety of Persons or Property; (3) 3.4.05, Failure to Follow SOP, Directive, Sheriff's Order - Standard Operating Procedure 117.02, IV, A, 4, a; (4) 4.8.04, Falsification of Official Documents; (5) 3.4.09, Respond to Radio Calls; and (6) 4.9.08, Conduct Unbecoming a Member of the Sheriff's Office. While the Internal Affairs investigation was being conducted, McCalister was placed on desk duty.

McCalister admits in his deposition that he knew he should not have left his off duty assignment without permission from a supervisor. McCalister admits that he lied to Corporal Collado regarding his reasons for leaving the SOHO apartments, because he was embarrassed

about the situation. McCalister further admits that he knew there were coalition military personnel living at the SOHO apartments and that he assumed that was why he was there.

On February 14, 2003, Major Bill Davis chaired a disciplinary hearing for McCalister on the six rule violations. During the hearing, McCalister, was provided the opportunity to tell those present the events of the night of December 16, 2002. At the conclusion of the hearing, Davis concurred with Internal Affairs' findings that the allegations were sustained, and concurred with the disciplinary recommendation of dismissal. McCalister appealed the disciplinary recommendation to the Disciplinary Review Board.

On February 26, 2003, McCalister represented himself before the Disciplinary Review Board, admitted that the allegations against him were true and rightly sustained, and pled for less severe discipline. However, the Board found that the seriousness of the violations warranted dismissal. The Board commented that "the nature of their [SOHO residents] military assignments [Homeland Security] is critical and for a deputy sheriff to vacate his responsibilities is unconscionable."[2]

McCalister did not appeal the disciplinary decision to the Civil Service Board.

On February 27, 2003, McCalister requested a meeting with Sheriff Cal Henderson. On March 17, 2003, McCalister met with Sheriff Henderson. McCalister's friend, who also is an attorney, Brook Nutter, Esq., accompanied him to the meeting. During the meeting, the possibility of imposing a lesser discipline or allowing McCalister to retire was discussed.

---

[2] *See* Affidavit of Linda Unfried, Dkt. #24-4, Exhibit "B."

Henderson informed McCalister that under the circumstances he could not keep him, but that if McCalister wanted, he could retire and move on to another agency. The opportunity for McCalister to voluntarily resign (rather than involuntary dismissal) would allow McCalister to retain his law enforcement certification.

On March 21, 2003, McCalister wrote a memorandum notifying his employer of his decision to retire from the Sheriff's Office. As a result of his voluntary resignation, McCalister was not dismissed from his employment with the Sheriff's Office.

## Summary Judgment Standard

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)(emphasis in original). The substantive law applicable to the claimed causes of action will identify which facts are material. *Id*. Throughout this analysis, the judge must examine the evidence in the light most favorable to the non-movant and draw all justifiable inferences in her favor. *Id*. at 255.

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the

nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. The evidence must be significantly probative to support the claims. *Anderson*, 477 U.S. at 248-49.

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir.1983). A dispute about a material fact is genuine and summary judgment is inappropriate if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248; *Hoffman v. Allied Corp.*, 912 F.2d 1379 (11th Cir. 1990). However, there must exist a conflict in substantial evidence to pose a jury question. *Verbraeken v. Westinghouse Elec. Corp.*, 881 F.2d 1041, 1045 (11th Cir. 1989).

## Discussion

### I.   Violation of Title VII - Count I.

Title VII prohibits employers from discriminating on account of race, gender, or national origin when hiring, discharging, and promoting its employees. *See* 42 U.S.C. §2000e-2(a)(1). In an employment discrimination case, the plaintiff bears the ultimate burden of proving that the defendant intentionally discriminated against the plaintiff. *See Texas Dept. Of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). Because direct evidence of discrimination can be difficult to produce, the Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), created a framework on the burden of production and order of presentation of proof to analyze circumstantial evidence of discrimination.  Where, as here, there is no direct evidence of racial discrimination, "the plaintiff must produce sufficient evidence to support an inference that the defendant employer based its employment decision on an illegal criterion.  *Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1441 (11th Cir. 1998).  Pursuant to the Supreme Court's decision in *McDonnell Douglas*, to prove discriminatory treatment through circumstantial evidence: (1) a plaintiff must prove a prima facie case of discrimination; (2) then the burden shifts to the defendant to show a nondiscriminatory reason for the employment action; and (3) then the burden shifts back to the plaintiff to establish pretext.  *See McDonnell Douglas.*

**A.     Plaintiff's initial burden to prove a prima facie case of discrimination.**

The plaintiff must prove that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment action; (3) his employer treated similarly situated employees, who were not members of the same protected class, more favorably; and (4) he was qualified to do the job.  *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

Plaintiff has sufficiently established three out of the four prongs required to establish a violation of Title VII: Plaintiff is a member of a protected class; Plaintiff was subjected to an adverse employment action; and Plaintiff was qualified to do the job.  The Court will now examine the remaining prong of whether Plaintiff has established that Defendant treated similarly situated employees, who were not members of the same protected class, more favorably.

### 1.    Plaintiff's Allegations and Proffered Evidence as to "Similarly Situated Employees."

In support of Count I, Plaintiff has alleged: that he was forced to resign from his position as a Hillsborough County Deputy Sheriff because of his race; that there are and were similarly situated white employees who have committed acts far worse than Plaintiff and were not forced to resign; that the defendant has had and continues to have similarly situated white Deputy Sheriffs in its employ who have falsified 129 official documents, left the scene of an Off-Duty Assignment, committed criminal acts of Domestic Battery, associated with criminals, inappropriately used communications facilities, committed acts of negligence and also committed misdemeanors; and that the Defendant deliberately discriminated against Plaintiff because of his race when it forced the Plaintiff to resign.

During Plaintiff's deposition, Plaintiff testified as follows:

Q:    Okay. Do you know of anybody else who did what you did and wasn't subject to a recommendation of dismissal?

A:    If you are talking about precise incidents, I can't say.  But I know there have been deputies that committed acts that were disciplined and found guilty of acts that were subject for dismissal and they were not dismissed.

Q:    Who do you remember?

A:    Carmine Pasano, Aaron Rochelle, Sharon Stepnoski, Alan Ruiz, Timothy Locke – or Michael Locke, I should say.

Q:    Take them down for me.  Pasano was the first one?

A:    Correct.

Q:    What did he do?

A:    I don't know.  He falsified documents like 129 times, 144 times, conduct unbecoming. He was found guilty of that, which by SOP book is a dismissible charge.  He was not dismissed.

Q:    Okay.

A:    And he's Caucasian.

Q:    Who else?

A:      Alan Ruiz.

Q:      What happened to Mr. Ruiz?

A:      If I'm correct, he falsified a document that called for a dismissal, and they charged him with a lower charge, and he kept his employment.

Q:      Who else?

A:      Sharon Stepnoski.  She was charged with DUI.

Q:      All right.  Who else?

A:      Michael Locke.

Q:      What do you remember he did?

A:      What didn't he do?  Whatever specific charge he was charged with, they were called for dismissal, and he wasn't dismissed.

Q:      Did any of those people leave an assignment?

A:      I don't know.

Q:      Are you aware of anyone who left an assignment and was treated differently than you were?

A:      I can't say you know.  I've known plenty of people that have left assignments. Whether or not they were disciplined or not or anybody found out or not, I can't say.

Q:      Do you know of anyone who was charged with falsifying documents when the documents involved pay?

A:      Carmine Pasano, Al Ruiz.

* * *

Q:      Okay.  Anyone else you can think of that you think was treated differently?

A:      Not off the top of my head right now, I can't.

* * *

Q:      Okay.  Do you know if you were treated any differently than any other people who were under investigation?

A:      As far as around the workplace?

Q:      Yeah.

A:      I can't recall.  I don't know.[3]

    In response to Defendant's interrogatories and request for production relating to facts establishing that "there are similarly situated white employees who have committed acts far worse than Plaintiff and were not forced to resign," Plaintiff identified the following employees and the following acts: Carmine Pisano (falsified 129 documents, domestic

---

[3] *See* Deposition of Ronald McCalister dated November 23, 2005, Dkt. #23-2, Page 67, Line 4 - Page 70, Line 1.

battery, misdemeanor), Michael Locke (left the scene of an Off-Duty Assignment), Thomas

Kelly (left the scene of an Off-Duty Assignment), Thomas Hill (left the scene of an Off-Duty

Assignment), Al Luis (left the scene of an Off-Duty Assignment,  inappropriately used

communications facilities, acts of negligence), Hugh Crawford (left the scene of an Off-Duty

Assignment), Richard Dibitonto (associated with criminals, inappropriately used

communications facilities), Sharon Stepnowski (acts of negligence, misdemeanor), Emanuel

Feller ( inappropriately used communications facilities, misdemeanor), Paul Davis (acts of

negligence), Ed Rochelle (misdemeanor).  Additionally, the Officer Resumes of four Deputy

Sheriffs (Sergeant Douglas Richards, Deputy Richard Dibitonto, Sergeant Carmine Pisano,

and Deputy Michael Locke) were attached to Plaintiff's Response to Plaintiff's Request for

Production.[4]

The Officer Resumes provide the following information, in pertinent part:

a)      Sergeant Douglas Richards

i.      Allegation(s): Supervisor Responsibility - Sustained,

Conduct Unbecoming A Member of the Sheriff's Office - Sustained,

Failure to Follow SOP, Directive, Sheriff's Order - Sustained.

Disciplinary Action: Suspension for 14 days on Oct. 27, 2003.

b)      Deputy Richard Dibitonto

---

[4] The Court will not address allegations that are designated as "unfounded" or "unsubstantiated" which did not result in disciplinary action.  Further, allegations or complaints against officers of which the officers were ultimately exonerated are also excluded from this Court's review, since it would be inappropriate to discipline an exonerated individual.

      i.      Allegation(s): Association With Criminals - Sustained,

            Use of Communications Facilities - Sustained.

            Disciplinary Action: Suspension for 10 days on May 26, 2004.

c)     Sergeant Carmine Pisano

      i.      Allegation(s): Misdemeanor Not Affecting - Sustained.

            Disciplinary Action: Suspended 1 day on August 10, 1988.

      ii.     Allegation(s): Discourtesy - Sustained.

            Disciplinary Action: Letter of Counseling issued on April 3, 1991.

      iii.    Allegation(s): Falsification of Official Documents x 129 - Sustained,

            Failure to Follow SOP, Directive, Sheriff's Order - Sustained,

            Conduct Unbecoming A Member of the Sheriff's Office - Sustained.

            Disciplinary Action: Suspension for 168 days on June 9, 2004.

d)     Deputy Michael Locke

      i.      Allegation(s): Off Duty Work - Sustained,

            Careless w/o loss - Sustained,

            Not follow SOP - Sustained.

            Disciplinary Action: Suspension for 10 days on July 15, 1997.

      ii.     Allegation(s): Not Follow SOP - Sustained.

            Disciplinary Action: Letter of Counseling Nov. 23, 1998.

      iii.    Allegation(s): Failure to Respond to A Subpoena - Sustained.

            Disciplinary Action: Suspension for 1 day on March 26, 2002.

     iv.     Allegation(s): Failure To Report For Duty Due To Improper Conduct -

     Sustained.

     Disciplinary Action: Written Reprimand Sep. 6, 2002.

    **2.**     **Standard for Determining "Similarly Situated Employees."**

To establish a prima facie case Plaintiff must show that there were employees, not

within his protected class, who were similarly situated in all relevant respects, but who were

treated more favorably.  *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997).  As the

Eleventh Circuit explained in *Maniccia v. Brown*,

> In determining whether employees were similarly situated and more favorably
> treated, the Court must consider whether the employees involved in or accused
> of the same or similar conduct were disciplined in different ways.  The most
> important factors in the disciplinary context are the <u>nature of the offenses
> committed and the nature of the punishments imposed</u>.  We require that the
> quantity and quality of the comparator's misconduct be <u>nearly identical</u> to
> prevent courts from second-guessing employers' reasonable decisions and
> confusing apples with oranges (emphasis added.)  *Maniccia v. Brown*, 171
> F.3d. 1364, 1368.

Accordingly, this Court will compare the nature of Plaintiff's offenses and the severity of the

punishments imposed upon Plaintiff to those of the officers identified as "similarly situated"

by Plaintiff, in order to determine whether the identified officers were indeed similarly

situated and more favorable treated.

    **3.**     **Comparison of Plaintiff's Offenses to Other Employee's Offenses.**

McCalister violated the following six Sheriff's Office rules: a) Leaving Assigned

Work Area; b) Negligence - Associated with Safety of Persons or Property; c) Failure to

Follow SOP, Directive, Sheriff's Order; d) Falsification of Official Documents; e) Respond

to Radio Calls; and f) Conduct Unbecoming a Member of the Sheriff's Office.  Plaintiff has not identified a similarly situated employee who has also violated six Sheriff's Office rules in one day as a result of improper behavior.  Rather, Plaintiff points to numerous individuals that may have violated one, two, or three of the same rules, but were not dismissed.

It is clear that the most serious violation, out of the six violations alleged against Plaintiff, was leaving his assigned work area.  Plaintiff was the only Law Enforcement Officer assigned to the SOHO apartments on the night of December 16, 2002.  It was his duty to maintain a fully armed presence at all times; remain in/or around the Law Enforcement vehicle in a highly visible location by the front office of the SOHO apartments; execute a foot patrol throughout the entire SOHO apartments randomly at approximately two-hour intervals; and be on site at all times during duty hours.  Plaintiff admits in his deposition that he knew that military personnel lived in the apartments and he assumed that was why he was there.  When Plaintiff left the SOHO apartments at 4:00 a.m. to visit a woman that he barely knew, he took with him the only law enforcement presence available to the sleeping inhabitants of the SOHO apartments.  While it appears that Plaintiff did not take his duty seriously, Defendant was contractually bound to take it seriously, especially considering the sensitivity of the times after September 11, 2001 and subsequent terrorist threats and concerns near military bases such as the MacDill Airforce Base.

### a.    Leaving An Assigned Work Area.

Plaintiff has alleged in his complaint that there were similarly situated white employees who left the scene of an Off-Duty Assignment and were not punished as severely

as Plaintiff.   Plaintiff has identified in Plaintiff's Response to Defendant's First Interrogatories the names of five employees (Michael Locke, Thomas Kelley, Thomas Hill, Al Luis, and Hugh Crawford) who allegedly left the scene of an Off-Duty Assignment. Other than raw accusations, Plaintiff has not offered further information as to Thomas Kelley, Thomas Hill, Al Luis, or Hugh Crawford regarding the date of the alleged violations, whether charges were ever brought against these individuals, whether the charges were sustained, or the severity of the disciplinary action against them, if any.

Plaintiff only offers documentation and information as to the nature of the offenses and the disciplinary results as to one of these individuals, Michael Locke.  Apparently, in September of 1997 (six years prior to Plaintiff's disciplinary action), allegations were brought against Michael Locke for: "Off-Duty Work," "Carelessness without Loss," and "Not Following SOP."   As a result of these allegations, Michael Locke was suspended for fifteen (15) days.  No further information is offered in explanation of the underlying facts and circumstances of these allegations, nor does the Plaintiff offer evidence to establish that Michael Locke actually "left an assigned work area."  Without such evidence, Michael Locke cannot be said to be "similarly situated" to Plaintiff.  Five years later on June 24, 2002, allegations were brought against Michael Locke for "Failure to Report for Duty Due to Improper Conduct."   Michael Locke received a written reprimand as a result of this allegation.  No further information is offered in explanation of the underlying circumstances of this allegation, except for a handwritten notation next to the allegation stating "motorcycle crash."

In Plaintiff's deposition testimony, Plaintiff admits that he is not aware of anyone who was disciplined as a result of leaving an assignment.  Further during his deposition, Plaintiff was specifically asked, "Do you know of anybody else who did what you did and wasn't subject to a recommendation of dismissal?"  Defendant responded, "If you are talking about precise incidents, I can't say."

Accordingly, Plaintiff has failed to identify a similarly situated employee that was charged with the offense of "Leaving an Assigned Work Area."

> **b.      Negligence - Associated with Safety of Persons or Property.**

Plaintiff has alleged in his complaint that there were similarly situated white employees who committed acts of negligence.  Plaintiff has alleged that Sharon Stepnowski was charged with a DUI, but the Plaintiff does not offer evidence establishing whether such charges were sustained, when the alleged DUI occurred, whether Stepnowski was on duty, or the severity of the disciplinary action against her, if any.  Plaintiff has identified in Plaintiff's Response to Defendant's First Interrogatories the names of three employees (Sharon Stepnowski, Carmine Pisano, and Emanuel Feller) who allegedly committed acts of negligence.  Other than raw allegations, Plaintiff has not offered further information as to acts of negligence by Sharon Stepnowski, Carmine Pisano, or Emanuel Feller, such as the date of the alleged actions, whether charges were ever brought against these individuals, whether the charges were sustained, and the severity of the disciplinary action, if any.

Accordingly, Plaintiff has failed to identify a similarly situated employee that was charged with the offense of "Negligence - Associated With Safety of Persons or Property."

### c.      Failure to Follow SOP, Directive, Sheriff's Order.

In Count I, Plaintiff has not alleged that there were other similarly situated white employees that failed to follow a SOP, Directive, Sheriff's Order, and received more favorable treatment. Thus, the Court will not address this violation. Additionally, the Court is unable to determine the seriousness of the violation without further information regarding the underlying facts and circumstances of an order. Plaintiff has offered no evidence regarding the underlying facts and circumstances of any orders given to a similarly situated employee that was treated more favorably.

### d.      Falsification of Official Documents.

During his deposition, Plaintiff identified Carmine Pisano and Alan Ruiz[5], as two similarly situated employees that have also been charge with falsifying official documents, but were not dismissed. Plaintiff has alleged that the falsified official documents relate to time sheets. However, Plaintiff has been unable to identify another employee that falsified official documents and committed five other violations on the same day. It appears that on March 3, 2004, approximately a year after Plaintiff resigned, charges were brought against Pisano relating to the falsification of 129 official documents. Pisano was also charged with "Failure to Follow SOP, Directive, Sheriff's Order" and "Conduct Unbecoming A Member of the Sheriff's Office." These three allegations were sustained and Pisano was suspended for 168 days. Thus, Pisano committed three out of the six violations Plaintiff was charge

---

[5] No other documentation or information has been provided in order to substantiate Plaintiff's allegations as to Alan Luiz.

with and was disciplined by being suspended for over five months.  Nevertheless, Pisano was not charged with "Leaving An Assigned Work Area" which is clearly the most serious charge sustained against Plaintiff; therefore, Pisano is not a similarly situated white employee.

### e.    Failure to Respond to Radio Calls.

Plaintiff has not identified a similarly situated white employee who committed a violation relating to a failure to respond to a radio call or turning their police radio off while on duty.  Plaintiff has identified three employees, Richard Dibitonto, Al Luis, and Emanuel Feller, as similarly situated white employees charge with the allegation of "inappropriately using communications facilities."  The offense of "inappropriately using communications facilities" is not similar or nearly identical to the offense of failing to "respond to radio calls;" thus, none of these employees are similarly situated.

### f.    Conduct Unbecoming a Member of the Sheriff's Office.

Pursuant to the Officer Resumes attached to Plaintiff's Response to Defendant's First Request for Production, Plaintiff has identified two employees, Douglas Richards and Carmine Pisano, as similarly situated employees that committed like violations, but received more favorable treatment.  Douglas Richards was charged with violations of "Supervisor Responsibility," "Conduct Unbecoming A Member of The Sheriff's Office," and "Failure To Follow SOP, Directive, Sheriff's Order."  All charges were sustained and Richards was suspended for 14 days.  Carmine Pisano was charged with violations of "Falsification of Official Documents x 129," "Failure to Follow SOP, Directive, Sheriff's Order," "Conduct

Unbecoming A Member Of the Sheriff's Office."  All charges were sustained and Pisano was suspended for 168 days.  Once again, neither of these officers left their assigned post, were charged with negligence associated with safety of persons or property, or purposely turned their police radios off so they could not be reached while on the job.  While falsifying documents and failing to follow orders is improper, the nature of such violations cannot be compared to Plaintiff's purposeful violation of leaving his work area to drive to the other side of town to meet with a woman, while simultaneously turning his police radio off so that he could not be reached.

> **4.**      **Plaintiff has failed to establish that a similarly situated white employee was treated more favorable.**

Pursuant to the detailed comparison made by the Court herein, Plaintiff has failed to offer evidence that a similarly situated white employee committed a similar offense as Plaintiff, but received more favorable treatment.  Accordingly, Plaintiff has failed to establish a prima facie case of discrimination under Title VII.

> **B.**      **Defendant Provides A Legitimate, Nondiscriminatory Reason For Dismissal.**

Even assuming that Plaintiff was able to identify a similarly situated employee that committed an offense like Plaintiff's, but received more favorable treatment, Defendant has articulated a legitimate, nondiscriminatory reason supporting the dismissal of Plaintiff.[6]

---

[6] Defendant did not dismiss Plaintiff, rather Plaintiff voluntarily resigned or was "forced to resign" before Defendant issued official dismissal orders.

Defendant has explained the seriousness of Plaintiff's violations and the disregard shown for the safety and welfare of others by leaving his off-duty post without permission from a supervisor and without good cause. It is undisputed that McCalister committed each of the six rule violations. As a result of McCalister's lack of judgment, Defendant lost faith in McCalister's ability to perform his job. Defendant asserts that had McCalister not exercised the option to voluntarily resign, Defendant would have followed through with its decision to dismiss Plaintiff.

### C.   Plaintiff has failed to Establish Pretext.

Plaintiff has failed to establish that Defendant's proffered reasons for recommending that he should be terminated were pretextual. In order to establish that Defendant's reasons were pretextual, Plaintiff must show that both Defendant's articulated reason is false and the real reason was discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993). Further, at all times during the burden-shifting analysis, the Plaintiff bears the ultimate burden of proving intentional discrimination. *Id.*

### 1.   Off-Duty Versus On-Duty.

In Plaintiff's response to Defendant's Motion for Summary Judgment, Plaintiff has only offered conclusory allegations of pretext. Plaintiff's response states: "...[T]he Plaintiff was, as far as the Sheriff's Office and the State of Florida is concerned, was not even engaged in employment at that time..." and cites as precedent Section 440.091, Florida Statutes, which involves worker compensation claims for law enforcement officers. In short, Plaintiff argues that he could not have violated the procedure of the Sheriff's Office if he

wasn't working for the Sheriff at the time.[7]   Plaintiff's argument is unpersuasive for two reasons.   First, this case does not involve a worker's compensation claim; and therefore, Section 440.091 is irrelevant to the arguments at issue.   Second, whether Plaintiff was disciplined as a result of violations committed while on an "on-duty" job or an "off-duty" job, does not in any way establish Plaintiff's ultimate burden that Defendant violated Title VII by committing acts of intentional discrimination against Defendant.

### 2.   Deputy Timothy Locke's Traffic Stop.

Plaintiff also argues that Defendant's reasons for recommending the dismissal were in response to Defendant's fear of potential liability from the traffic stop made by Deputy Timothy Locke on the night of December 16, 2002.   Once again, Plaintiff only offers conclusory allegations of pretext.   Plaintiff has not offered any substantive evidence which would support such an argument.   Plaintiff never filed a written complaint against Deputy Timothy Locke.   Deputy Timothy Locke was not in a supervisory position over Plaintiff, nor did he make a racially charged comment to Plaintiff.   It appears that Plaintiff's behavior during the early morning hours of December 17, 2002, was unusual.

Accordingly, Plaintiff's conclusory allegations are insufficient to establish pretext and defeat summary judgment.

---

[7] Plaintiff does not explain why his off-duty work required that he wear his official uniform, prominently display his Sheriff's cruiser and be armed, and yet was not covered by Sheriff Department regulations.

## II.	Plaintiff's Section 1983 Claims - Count II.

A claim against a sheriff in his official capacity is equivalent to a claim against the county. *Pompey v. Broward County*, 95 F.3d 1543, 1545-46 n. 2 (11th Cir. 1996). To assert a §1983 claim against the county, a plaintiff must demonstrate: (a) the violation of Plaintiff's constitutional rights; and (b) that such violation was caused by the enforcement of a policy or custom of the county. *See Greer v. Hillsborough County Sheriff's Department*, 2005 WL 2416031, *1 (M.D. Fla. 2005); *see also McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004), citing *City of Canton, Ohio v. Harris*, 489 U.S. 378 (1989). In other words, Plaintiff must establish that Defendant's decision to "force him to resign" was made by Defendant pursuant to a "custom or policy" of acting contrary to an individual's constitutional rights. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (noting that a plaintiff must demonstrate that the alleged racial discrimination occurred pursuant to a custom or policy of the municipality). Or Plaintiff must establish that Defendant officially sanctioned the actions of an employee who acted in violation of Plaintiff's constitutional rights. *See Brown v. City of Fort Lauderdale*, 923 F.2d 1474, 1479-80 (11th Cir. 1991); *Samedi v. Miami-Dade County*, 134 F.Supp.2d 1320, 1349 (S.D. Fla. 2001) (noting that "[o]nly a decision maker vested with final authority to create policy can open the government to section 1983 municipal liability").

In the Complaint, Plaintiff alleges that he was deprived of his constitutional right to equal protection under 42 U.S.C. §1983 and identified Defendant's policy of forcing him to resign "because he was black" as a violation of his constitutional rights under §1983.

Clearly, if Defendant forced Plaintiff to resign simply because he is black, such action would violate Plaintiff's constitutional rights under the Fourteenth Amendment.

Nevertheless, demonstration of a violation of Plaintiff's constitutional rights alone is not enough to state a claim under §1983, Plaintiff must also specifically identify a policy or custom of Defendant that caused his injury. Plaintiff has not specifically identified a policy or custom of racial discrimination by Defendant. Nor has Plaintiff shown how Defendant, itself, acted in a discriminatory manner so as to be liable under §1983.[8] Plaintiff has not provided one scintilla of evidence which would substantiate his claim that Defendant maintains "employment practices" of forcing employees to resign "because they are black." Finally, the record provides no indication that Defendant acted on any information or basis other than the facially race-neutral reasons before it, specifically, that Plaintiff violated six Sheriff's Office rules: (1) 3.4.01, Leaving Assigned Work Area; (2) 3.5.02, Negligence - Associated with Safety of Persons or Property; (3) 3.4.05, Failure to Follow SOP, Directive, Sheriff's Order - Standard Operating Procedure 117.02, IV, A, 4, a: (4) 4.8.04, Falsification of Official Documents; (5) 3.4.09, Respond to Radio Calls; and (6) 4.9.08, Conduct Unbecoming a Member of the Sheriff's Office. Accordingly, Plaintiff has failed to establish a §1983 claim against Defendant.

---

[8] Neither has Plaintiff offered proof that Defendant officially sanctioned the actions of an employee who acted in violation of Plaintiff's constitutional rights.

**Conclusion**

Plaintiff has failed to establish a prima facie case of discrimination under Title VII by failing to show that Defendant treated similarly situated employees, who were not members of the same protected class, more favorably.   Defendant has provided a legitimate, nondiscriminatory reason for recommending Plaintiff's dismissal based on the seriousness of Plaintiff's numerous violations of the Sheriff's Office rules.   Additionally, Plaintiff has failed to establish that Defendant's reasons for recommending dismissal were pretextual. Finally, Plaintiff has failed to demonstrate that the alleged racial discrimination occurred pursuant to a specific policy or custom of Defendant. Accordingly, Plaintiff has failed to establish a §1983 claim against Defendant.   For these reasons, Defendant's Motion for Summary Judgment is granted.

It is therefore ORDERED AND ADJUDGED that:

1.      Defendant's Motion for Summary Judgment and Supporting Memorandum of Law (Dkt. #23-1) is GRANTED.

2.      The Clerk is directed to CLOSE this case and terminate all pending motions.

**DONE** and **ORDERED** in Tampa, Florida on April 11, 2006.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

**Copies furnished to:**
Counsel/Parties of Record

S:\Even\2004\04-cv-2588.msj.wpd